UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SANDHYA NAYAK,

                              Plaintiff,

        v.                                                      **DECISION AND ORDER**
                                                                07-CV-248S
ANTHONY R. PIVARUNAS, D.O., et al.,

                              Defendants.

## I.  INTRODUCTION

Plaintiff Sandhya Nayak (hereinafter, "Plaintiff") commenced this employment

discrimination action by filing a Summons and Complaint in the State of New York,

Supreme Court, County of Erie.  (Index No. 2007-003304.)  Therein, she alleges violations

of her First and Fourteenth Amendment rights under Section 1983 of the Civil Rights Act

of 1964, 42 U.S.C. § 1983.  Plaintiff also brings state law claims of breach of contract and

tortious interference with contractual relations and prospective economic advantage.

The case was removed to the United States District Court for the Western District

of New York on April 12, 2007.  (Docket No. 1.)  Presently before this Court is Defendants

Anthony Pivarunas, D.O. and James Hassett, M.D.'s Motion for Summary Judgment.[1]

(Docket No. 31.)  Also before this Court is Defendant University Medical Residence

Services, P.C.'s Motion for Summary Judgment.[2]  (Docket No. 37.)  Plaintiff opposes these

---

[1] In support of their Motion, Defendants Pivarunas and Hassett filed a Memorandum of Law; Rule 56 Statement of Undisputed Facts; Declarations of Dr. Anthony Pivarunas and Dr. James Hassett, with Exhibits; Reply Memorandum of Law; and all papers submitted in support of the Motion for Summary Judgment filed by University Medical Residence Services, P.C.

[2] In support of its Motion for Summary Judgment, University Medical Residency Services, P.C. filed a Memorandum of Law; Rule 56 Statement of Uncontested Facts, with Exhibits; Reply Affidavit; and all papers submitted in support of the Motion for Summary Judgment filed by Pivarunas and Hassett.

motions.[3]  For the reasons stated below, Defendants' motions are granted.

## II.  BACKGROUND

### A.    Facts

During the relevant time period, Defendant Anthony R. Pivarunas, D.O., (hereinafter,
"Dr. Pivarunas") was and continues to be the Program Director of the Obstetrics and
Gynecology Residency Program (hereinafter, "Program") at Sisters of Charity Hospital
(hereinafter, "Sisters") through the State University of New York at Buffalo School of
Medicine and Biomedical Science (hereinafter, "University").[4]   (Pivarunas and Hassett
Stmt. ¶ 1.)[5]  Plaintiff was accepted into the OB/GYN Program at the University as a third
year resident in May 2003.  (Pl. Aff. ¶ 6.)

Defendant James Hassett, M.D. (hereinafter, "Dr. Hassett") was and continues to
be Professor of Surgery and Program Director of the surgery residency program at the
University.  (Pivarunas and Hassett Stmt. ¶ 2.)

Defendant University Medical Resident Services, P.C. (hereinafter, "UMRS") is a
professional service corporation which serves as the formal employer of residents enrolled
in training programs sponsored by the University.  (Id. ¶ 3; Def. UMRS Memo., p. 2.)
Plaintiff was employed by UMRS until she was terminated from the Program on May 23,
2005.  (Pivarunas Dec., Ex. C; UMRS Stmt., Ex. B.)

---

[3]In opposition, Plaintiff filed a Rule 56 Statement of Disputed Facts in response to each
Defendants' Rule 56 Statement; a Memorandum of Law; Attorney Affirmation; and Affidavit of Plaintiff.

[4]The University is no longer a party to this action, as its motion to dismiss was granted on October
23, 2007.  (Docket No. 20.)

[5]Referring to Defendants' Pivarunas and Hassett Rule 56 Statement of Undisputed Facts.

### 1.   Plaintiff's Application and Acceptance into the Program

Plaintiff contacted the University in April 2003 to inquire about a third year residency position to commence July 1, 2003.  (Pl. Aff. ¶ 1.)  On May 2, 2003, she submitted Letters of Reference, a Personal Statement, and *Curriculum Vitae* (hereinafter, "*CV*") to Dr. Pivarunas.  (Id. ¶ 1; Pivarunas Dec. ¶ 3, Ex. A.)  She was interviewed by Dr. Pivarunas and other physicians at Sisters, and was subsequently offered the position.  (Pl. Aff. ¶¶ 3, 6.)

On June 8, 2003, Plaintiff submitted her Application and Employee Biographical Data Form (hereinafter, "Application") to the University.  (Pivarunas Dec., Ex. B.)  On that same date she signed a Residency Employment Agreement with UMRS.  (Id., Ex. C; UMRS Stmt., Ex. B.)

Relevant to this action, Plaintiff provided Dr. Pivarunas with a list of residency programs she previously attended.  (Pivarunas Dec., Ex. B.)  On both her *CV* and Application, Plaintiff indicated she completed her first and second year residencies at "LSU Medical Center/UNMC" from July 1998 to April 2000.  (Id., Ex. A, B.)  Further, that she was a resident at Lankenau Hospital for her second and third year from November 2001 up to the time of the interview.  (Id.)  During the interview, Dr. Pivarunas questioned why there was a gap in Plaintiff's residency from April 2000 to November 2001.  (Id. ¶ 5.)  Plaintiff informed him that she left LSU's residency program for family reasons.  (Id.)

The Application required that Plaintiff state whether she had "ever been dismissed from or the subject of disciplinary action at a hospital while [she] w[as] in graduate medical training or had another type of affiliation."  (Id., Ex. B.)  Plaintiff wrote a note in response, stating she was placed on "academic probation" at Lankenau and had to repeat six months

of her third year of residency.  (Id.)

Plaintiff began working at Sisters on July 1, 2003.  (Pl. Aff. ¶ 6.)  She completed her third year and was promoted to fourth year residency in July 2004.  (Id. ¶ 12.)  That same year, she became one of two chief residents of the OB/GYN Program.  (Pivarunas Dec. ¶ 18, FN.1.)  After Plaintiff finished her fourth year, Dr. Pivarunas forwarded a letter to the American Board of OB/GYN indicating the successful completion of her residency.  (Pl. Aff. ¶ 13.)  He also signed a Personnel Transaction Form on April 22, 2005, indicating she would graduate from the University in June.  (Id. ¶ 14.)

### 2.    Plaintiff's Complaints of Being Overworked

On November 28, 2004, Plaintiff complained of being overworked in an e-mail to Dr. Pivarunas.  (Pivarunas Dec., Ex. N.)  Her e-mail was in response to allegations from a supervising attending physician that Plaintiff had failed to fulfill her duties as chief resident on several occasions.  (Id.)  Plaintiff's e-mail stated that she had worked more than twenty-four hours continuously, and on two or more occasions, worked seven days in a row without twenty-four hours off.  (Id.)  Plaintiff stated she did not report these violations of resident work hour rules to the University or to IPRO, a Health Care Quality Watch Group, so that the department would not have problems.  (Id.)

On December 6, 2004, Dr. Pivarunas met with Plaintiff to discuss her assertions that she was overworked, and to find out why Plaintiff, who was responsible for scheduling residents, had not scheduled herself for time off.  (Id. ¶ 26.)  As a result of the meeting, Dr. Pivarunas took over the scheduling of residents previously done by Plaintiff and the other chief resident.  (Id. ¶ 28.)  Dr. Pivarunas instructed her to notify him if she found herself working more than twenty-four hours in a row, as she was allowed time off per the

Resident Manual.  (Id., Ex. O.)  He also told her to be forthcoming during University surveys and IPRO visits.  (Id. ¶ 29.)

The second time Plaintiff complained about being overworked was on May 3, 2005. (Id., Ex. U.)  On that date, Dr. Pivarunas had arranged to meet with Plaintiff to discuss, among other things, concerns he had regarding her professionalism and interpersonal skills. (Id. ¶ 36, Ex. U.)  Plaintiff responded that none of the issues were because of her; rather the problem was that others in the Program were not able to deal with her medical knowledge and her ability to do things.  (Id.)  She further stated that her poor behavior was the result of being overworked as chief resident and being on beeper call.  (Id., Ex. U.)

Plaintiff also stated she felt she had been unfairly denied time off for vacation.  (Id.) For instance, she was denied a week of vacation time in December 2004.  (Id.)  Dr. Pivarunas explained she was not granted the vacation time because the Resident Manual instructs that residents are not to take time off during the holiday season in addition to the time off they were already allotted.  (Id.)  He pointed out that the Program generously gave her sick time, vacation time, and days off for interviews.  (Id.)

### 3.    Probation

On May 14, 2005, Dr. Pivarunas received a complaint from Dr. Sheth, the supervising attending physician, and Dr. DeNagey, a resident, that Plaintiff refused to come to Sisters to evaluate a patient when she was chief resident of the day.  (Id. ¶ 43, Ex. W.) Dr. DeNagey reported he paged Plaintiff twice with no response.  (Id.)  He then called her house and Plaintiff refused to come in to the hospital.  (Id.)  Dr. Pivarunas contacted Plaintiff to discuss the situation and she denied ever being asked to come in.  (Id. ¶ 44.) Dr. Pivarunas checked with two nurses who were present when the phone call was made

and they confirmed Dr. Sheth and Dr. DeNagey's account.  (Id., Ex. X.)

As a result of this incident, Plaintiff was put on probation on May 14, 2005.[6]  (Id. ¶ 45.)  Dr. Pivarunas composed a letter explaining the probation and warning that further incidents demonstrating unprofessional behavior and dishonesty would result in dismissal from the program.  (Id., Ex. X.)

### 4.    Verification of Credentials

On March 23, 2005, Dr. Pivarunas sent a letter to Louisiana State University ("LSU") to verify Plaintiff's completion of her first and second years of residency so that she could sit for the OB/GYN Board examination.  (Id. ¶ 34, Ex. S.)  On April 15, 2005, he received a response from LSU stating Plaintiff completed her first year from July 1998 to June 1999.  (Id. ¶ 35, Ex. I.)  LSU would not discuss the situation any further.  (Id. ¶ 35.)  It was then that Dr. Pivarunas noticed discrepancies in Plaintiff's *CV* and Application.

On her *CV*, Plaintiff indicated she completed her first and second years at "LSU Medical Center/UNMC" from July 1998 to April 2000.  (Id., Ex. A.)  This led Dr. Pivarunas to believe, at the time of her interview, that she completed her first and second years at a single residency program.  (Id. ¶ 4.)  Similarly, on her Application, Plaintiff listed "LSU" and "UNMC" together under one bullet-point, making it appear she attended one residency program from July 1998 to April 2000.  (Id., Ex. B.)

During the May 3, 2005 meeting that resulted in Plaintiff being put on probation, Dr. Pivarunas learned Plaintiff had attended the University of Nebraska Medical Center

---

[6]Dr. Pivarunas received numerous complaints about Plaintiff's lack of professionalism and honesty throughout her employment, and counseled her about improving her performance in the areas of professional responsibility, patient care, and honesty. (See Pivarunas Dec. Ex. D-M, Q.)  However, he did not take any action based on complaints until the probation on May 14, 2005.

("UNMC") for her second year of residency.  (Id. ¶ 40.)  UNMC and LSU are unrelated programs.  (Id. ¶ 6.)  Dr. Pivarunas asked Plaintiff to sign a letter of release for a copy of her resident file at LSU, and she refused.  (Id. ¶ 39.)

Dr. Pivarunas sent a letter to UNMC on May 3, 2005 requesting documentation verifying Plaintiff's training and dates of affiliation.  (Id. ¶ 41, Ex. V.)  He received a letter from UNMC on May 20, 2005, stating Plaintiff accepted a second year position there and started her training on September 27, 1999.  (Id. ¶ 50)  She was placed on probation on March 30, 2000 and resigned from the program on May 1, 2000.  (Id; Ex. CC.)

### 5.    Termination and Grievance Hearings

On May 23, 2005, Plaintiff was terminated from the Program for misrepresenting facts on her employment application by not stating she was placed on academic probation at UNMC.  (Id. ¶ 54, Ex. EE.)  The Office of Graduate Medical Education (hereinafter, "OGME") Probation and Dismissal Policy states, "misrepresentation of facts or falsification of employment documents" are grounds for an automatic dismissal.  (Id. ¶ 55, Ex. FF, Probation and Dismissal Policy.)

Furthermore, the OGME Grievance Procedure Policy (hereinafter, "grievance policy") provides, "termination or non-renewal based on falsification or omission of application information and supporting documents" is a non-grievable matter.  (Id., Ex. FF, Grievance Procedure Policy, Section (3)(B)(2).)  Despite this, Dr. Pivarunas met with Plaintiff on May 23, 2005 to discuss the grounds for her termination, pursuant to Level I of the grievance policy.  (Id. ¶ 56.)  When questioned about her time at UNMC, Plaintiff responded that she was never placed on academic probation because she chose to resign. (Id., Ex. GG.)  When Dr. Pivarunas showed her the letter from UNMC stating she was

7

placed on probation on March 30 and resigned on May 1, Plaintiff retracted her story and stated that she was placed on probation, but it was later rescinded.  (Id.)  Dr. Pivarunas saw no reason to reinstate Plaintiff.

Plaintiff requested and was granted a Level II grievance hearing, which was conducted on October 21, 2005.  (Pivarunas and Hassett Stmt. ¶ 56.)  The Level II grievance committee (hereinafter, "committee") was comprised of Dr. Hassett and two other randomly selected doctors affiliated with the University.  (Id.)  In accordance with University policy, Dr. Pivarunas and Plaintiff were able to present evidence and witnesses, cross-examine opposing witnesses, and submit pre and post-hearing memoranda to the committee. (Pivarunas Dec. ¶ 60.) During the hearing, the committee asked about a legal action commenced against Lankenau.  (Id., Ex. II.)  Plaintiff denied "initiating" an EEOC action.  (Id.)

The committee was unable to determine whether Plaintiff discussed her previous problems at other residencies during the interview as she claimed, but noted that "[a] resident who has had previous experiences in four programs will clearly have problems and may not be completely forthcoming when seeking employment." (UMRS Stmt., Ex. D.) At the close of the hearing, the committee concluded that Plaintiff may have been disingenuous when she did not actively divulge complete information about her residency programs; however, it was Dr. Pivarunas' responsibility to check her previous experience before hiring her, and found there was ample opportunity for him to do so.  (Id.)  Therefore, it rescinded her termination.  (Id.)

Shortly after the Level II hearing, Sisters learned that, contrary to her testimony during the Level II hearing, Plaintiff had filed an EEOC complaint against Lankenau

Hospital.  (Pivarunas Dec. ¶ 61, Ex. HH.)  Sisters also received information that Plaintiff had been enrolled in another residency program, the Ochsner Clinic Foundation Family Practice Residency Program (hereinafter, "Ochsner"), from July 1999 to August 1999.  (Id. ¶ 51.)  That information was not included in her *CV* or Application.  (Id. ¶ 61, Ex. DD.)

Dr. Pivarunas then requested a Level III hearing, which was held on February 6, 2006.  (Pivarunas and Hassett Stmt. ¶ 74; Pivarunas Dec. ¶ 62.)  Although the Level III committee agreed with the Level II committee, that "it is the responsibility of the program director to perform due diligence of an applicant," they found it impossible for the director to do so "if an applicant does not list an experience or confuses the program director by listing two residencies as one."  (Pivarunas Dec., Ex. II.)  The committee reviewed the EEOC filing, which the Level II committee did not have a copy of.  (Id.)  Plaintiff alleged to the EEOC that she was fired from Lankenau Hospital, but did not include that information on her Application.  (Id.)  The committee found this added to Plaintiff's pattern of misleading statements and actions, which now included her having informed the Level II committee that she did not initiate a complaint against Lankenau.  (Id.)  As a result, it overturned the Level II determination.  (Id.)

In the spring of 2006, Plaintiff made a complaint to the Public Health Council (hereinafter, "PHC") that she had been unfairly and unlawfully terminated from employment.  (Pl. Aff. ¶ 48.)  The PHC issued a decision on December 12, 2006 stating the reasons Sisters cited for suddenly terminating Plaintiff three days before graduation were not credible due to the fact that Dr. Pivarunas signed a Personnel Transaction Form on April 22, 2005 denoting intent to graduate her on June 19, 2005.  (Id.)  The PHC then directed Sisters to review the termination of Plaintiff's residency.  (Id.)

9

**B.      Procedural History**

Plaintiff filed her Complaint with the Clerk of the State of New York, Supreme Court, County of Erie on April 3, 2007.   (Index No. 2007-003304.)  UMRS removed this action to this Court on April 12, 2007.  (Docket No. 1.)  UMRS filed an Answer on April 23, 2007.  (Docket No. 4.)   Dr. Pivarunas filed an Answer on April 25, 2007.   (Docket No. 6.)  Plaintiff's claims against the University and her § 1983 claim against Dr. Hassett in his official capacity were dismissed on 11th Amendment sovereign immunity grounds on October 23, 2007.  (Docket No. 20.)  Plaintiff's breach of contract claim against Dr. Hassett was dismissed as a matter of law on that same date.  (Id.)  Dr. Hassett filed an Answer on November 5, 2007.  (Docket No. 22.)

Drs. Pivarunas and Hassett filed their Motion for Summary Judgment on February 27, 2009.   (Docket No. 31.)   UMRS also filed its Motion for Summary Judgment on February 27, 2009.  (Docket No. 37.)

## III.  DISCUSSION AND ANALYSIS

**A.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."
Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn
from the evidence must be "viewed in the light most favorable to the party opposing the
motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26
L.Ed.2d 142 (1970).  Summary judgment is proper "only when reasonable minds could not
differ as to the import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).
The function of the court is not "to weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of
Appeals for the Second Circuit has explicitly cautioned district courts to use extra care
when deciding whether to grant summary judgment because "the ultimate issue to be
resolved in such cases is the employer's intent, an issue not particularly suited to summary
adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y.
1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)).
Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere
incantation of intent or state of mind would operate as a talisman to defeat an otherwise
valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  Indeed, the Second
Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted,
expensive and harassing trials – apply no less to discrimination cases than to commercial
or other areas of litigation." Id.

11

**B.    § 1983 Fourteenth Amendment Due Process Claim**

The Fourteenth Amendment's Due Process Clause prevents state officials from depriving "any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, sec. 1.   Plaintiff alleges both procedural and substantive due process violations.

**1.    Procedural Due Process**

Plaintiff argues Drs. Pivarunas and Hassett violated the Fourteenth Amendment when they terminated her without following the University's prescribed grievance procedures.  (Pl.'s Memo., p. 13.)  Defendants argue that even though termination for falsifying information on the Application is a non-grievable matter, Plaintiff was still afforded all of the protections of the University's grievance policy, and was given more process than constitutionally required.  (Defs.' Pivarunas and Hassett Memo., pp.7,11-12.)

To prevail on a procedural due process claim, a plaintiff must first establish that the defendant's actions deprived her of either a liberty or property interest recognized by law. Bd. of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Defendants do not dispute that Plaintiff had a property interest in continuing her employment and residency in the Program until graduation.[7]

Next, the Court must decide whether the sufficient amount of due process was

---

[7]To the extent Plaintiff bases her due process claim on the denial of her liberty interest in her reputation, the claim must fail.  (Compl. ¶ 83.)  It is true that "when a state actor attacks a person's good name in a manner that makes it 'virtually impossible' for the person to find new employment, that person's liberty interest to pursue his occupation is infringed." Fenje v. Feld 398 F.3d 620, 627 (7th Cir. 2005) (quoting Beischel v. Stone Bank Sch. Dist., 362 F.3d 439 (7th Cir. 2004)).  However in order for the claim to survive, the public official must have made false, defamatory statements of facts about the Plaintiff and her termination. Fenje, 398 F.3d at 627.  The record contains no facts supporting this, as Dr. Pivarunas's reasons for Plaintiff's dismissal were true: Plaintiff was not forthcoming about her past residencies.

afforded to Plaintiff.  The fundamental rights of due process are notice and the opportunity to be heard.  Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 906, 47 L.Ed.2d 18 (1996); Bell v. Burson, 402, U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971).  Defendants argue that Plaintiff's dismissal was "academic" rather than "disciplinary." (Defs.' Pivarunas and Hassett Memo., pp. 2-4; Def.'s UMRS Memo., pp. 9-12.)  Plaintiff does not dispute this was an academic dismissal.

The United States Supreme Court has declined to ignore the considered judgment of educators and formalize the academic dismissal process by requiring a hearing.  Bd. of Curators of Univ. of Missouri v. Horowtiz, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978).   Thus, when an institution dismisses a resident from a medical training program for "academic" reasons, notice and an opportunity to respond to the institution's actions are all that is constitutionally required.  Ezekwo v. N.Y.C. Health & Hosp. Corp., 940 F.2d 775, 785 (2nd Cir. 1951); see e.g., Navato v. Sletten, 560 F.2d 340, 345 (8th Cir. 1997) (minimum procedural due process requires an opportunity for a hearing and some kind of prior notice of the matter which is pending for a physician in a residency training program).  In addition, the institution's decision to dismiss must be "careful and deliberate." Horowitz, 435 U.S. at 85-87 & n. 3, 98 S.Ct. at 953 & n. 3.

In this case, Plaintiff was given notice that "false or misleading information may disqualify [her] for the position and/or if hired would result in [her] dismissal from [her] residency position," as she attested to this when she signed the Application.  (Pivarunas Dec., Ex. B.)  Moreover, the University's grievance policy states, "falsification or omission of application information and supporting documents" is a non-grievable matter.  (Id., Ex. FF.)  Nevertheless, Dr. Pivarunas afforded Plaintiff a Level I hearing to inform her of her

termination, to discuss the reasons, and to consider her response.  (Id. ¶ 56.)  After she was terminated, Defendants afforded Plaintiff a post-deprivation hearing by granting her a Level II grievance hearing.  During the hearing, Plaintiff was able to make oral presentations, call witnesses, cross-examine opposing witnesses, introduce evidence, and submit memoranda.  (Hassett Dec. ¶¶ 13-16.)  Plaintiff was afforded the same during the Level III hearing.

Plaintiff argues she was denied due process because Dr. Pivarunas and Dr. Hassett substantially deviated from the University's grievance procedures at the Level III hearing. (Pl. Memo., p. 19.)  First, she states Dr. Pivarunas initiated the Level III review based on information in existence since August 2003 (her EEOC charge).  (Pl. Memo., pp. 20-21.) Thus the information was not new and was not relevant to the stated basis for her termination.  (Id. p. 20.)  Second, Dr. Hassett's involvement in the Level III hearing was inappropriate since he served as Chairman at the Level II hearing.  (Id.)

The University's Grievance Procedures states that a Level III review may be requested only when (a) either party believes the Level II outcome is contrary to University policy or law, or (b) relevant new information is presented that was not available at the time of the Level II Hearing.  (Pivarunas Dec., Ex. FF, Grievance Procedure Policy, p.5.)  Dr. Pivarunas requested a Level III grievance hearing on both bases under the Policy.  (UMRS Stmt., Ex. G.)  First, he believed that the outcome was contrary to the University's policy, which specifically states, "automatic dismissal may be considered for misrepresentation of facts or falsification of employment documents."  (Id.)  Second, new information became available "that demonstrate[d] the Resident provided false and/or disingenuous information to the Level II Committee" including an EEOC complaint against Lankenau Hospital and

14

the fact that she was enrolled in another residency program that she neglected to include in her Application.  (Id.)

It is true that the EEOC complaint had been filed at the time of the Level II hearing, but that does not preclude it from being considered "new evidence."  During the Level II hearing, Plaintiff was questioned about a legal action she was involved in with Lankenau Hospital.  (UMRS Stmt., Ex. D.)  Plaintiff admitted she was the subject of an investigation, but denied initiating the EEOC complaint.  (Id.)  She would not identify who initiated the complaint and would not elaborate on the circumstances or the outcome.  (Id.)  Thus, finding out that Plaintiff herself signed the complaint and stated on it that she was fired from Lankenau was, in fact, new evidence to Defendants.  In addition, failing to disclose her termination from Lankenau is not a new issue, as it adds to her pattern of misrepresentation and deceit, for which Dr. Pivarunas terminated her.

Moreover, Defendants argue Dr. Hassett's involvement in the Level III hearing was confined to relaying what happened during the Level II hearing since the proceeding was not transcribed or recorded.  (Pivarunas and Hassett Memo., p. 12.)  Dr. Hassett concluded by stating that had Plaintiff admitted to initiating the EEOC complaint, he would have voted to uphold Plaintiff's termination.  (Hassett Dec. ¶ 14; See Pivarunas Dec., Ex.  II, Level III Grievance Summary.)  At that time, he was randomly selected as chairperson of the Level II committee, had no affiliation with Sisters, and was not acquainted with either Plaintiff or Dr. Pivarunas.  (Hassett Dec. ¶ 15.)  The Court finds that there is nothing in the University's grievance policy that restricts Dr. Hassett from testifying at the Level III hearing.

Thus, Dr. Pivarunas' decision to terminate Plaintiff and request a Level III hearing was "careful and deliberate" and followed all of the University's policies and procedures,

as did Dr. Hassett's participation in the hearings.  In sum, Plaintiff was given notice and two post-deprivation hearings, and thus, was not deprived of due process under the Fourteenth Amendment.

### 2.    Substantive Due Process

Plaintiff also alleges in her pleadings that Dr. Pivarunas and Dr. Hassett acted in an unlawful, malicious and capricious manner when they contrived reasons to prevent Plaintiff from graduating, which resulted in her termination.  (Compl. ¶¶ 85-87.)  Plaintiff further asserts Defendants' decisions and actions represented a substantial departure from the accepted academic norms of the University.  (Id. ¶ 92.)  Defendants contend Plaintiff's dismissal from the Program was not arbitrary and capricious as they correctly followed the University's grievance policy after Plaintiff showed a pattern of dishonesty and falsification. (Pivarunas and Hassett Memo., pp. 9, 13.)

"The doctrine of substantive due process protects the individual against certain government actions 'regardless of the fairness of the procedures used to implement them.'" McClary v. O'Hare, 786 F.2d 83, 88 (2nd Cir. 1986) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).  To prevail on a substantive due process claim, "a plaintiff must show a fundamental right protected by the constitution, a deprivation of that right, and 'arbitrary' and 'outrageous' state conduct that... 'shocks the conscience." Walker v. City of Waterbury, 601 F.Supp.2d 420, 424 (D.Conn. 2009).  In order to "shock the conscience," conduct must be such that it "offend[s] even hardened sensibilities," or constitute force that is "brutal" and "offensive to human dignity." Rochin v. California, 342 U.S. 165, 172-74, 72 S.Ct. 205, 209-11, 96 L.Ed. 183 (1952), cert. denied, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991).

16

The Supreme Court has warned that courts reviewing the substance of an academic dismissal "should show great respect for the faculty's professional judgment," because "an expert evaluation of cumulative information [is] not readily adapted to the procedural tools of judicial or administrative decisionmaking." Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225 & 226, 106 S.Ct. 507, 513 & 514, 88 L.Ed.2d 523 (1985) (citing Horowitz, 435 U.S. at 89-90 & 96, n. 6, 98 S.Ct. at 954-955 & 958, n. 6). Consequently, the court may not override the faculty's professional decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 474 U.S. at 225, 106 S.Ct. at 513.

As mentioned above, Defendants do not dispute Plaintiff has a constitutionally protected property interest in her continued enrollment in the Program. And, since she was terminated from the program, Plaintiff has been deprived of that right.

The alleged misconduct by Defendants amount to Dr. Pivarunas terminating Plaintiff and asking for a Level III hearing, and Dr. Hassett testifying at the Level III hearing. As discussed, *infra*, the record clearly shows that Defendants followed the University's established grievance policy in terminating Plaintiff and requesting and participating in the hearings. Such activity is not "a malicious and sadistic abuse[] of government power that [is] only intended to oppress or cause injury and serve no legitimate government purpose." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2nd Cir. 2001). In addition, there is nothing in the record that would support an inference that Drs. Pivarunas and Hassett contrived reasons to prevent Plaintiff from graduating. Documentary evidence specifically shows that LSU and UNMC are two separate residencies, Plaintiff was put on

17

probation from UNMC, she was terminated from Lankenau, and attended a residency program at Ochsner.  None of these things were clearly indicated on her *CV* or Application; thus Plaintiff made misrepresentations.

Plaintiff has not put forth sufficient facts for a jury to conclude there was no rational basis for Dr. Pivarunas' decision to terminate her.  Drs. Pivarunas and Hassett exercised their professional judgment, and their actions were neither arbitrary nor capricious.

\*     \*     \*

Based on the foregoing, Defendants' motions for summary judgment on Plaintiff's due process claim are granted.

Because the Court grants Defendants' motions for summary judgment as to Plaintiff's § 1983 claims, it need not consider whether Dr. Pivarunas  and Dr. Hassett are entitled to qualified immunity.

## C.    § 1983 First Amendment Retaliation Claim

"A section 1983 claim lies where the government takes negative action against an individual because of [her] exercise of rights guaranteed by the Constitution or federal laws." Friedl v. City of N.Y., 210 F.3d 79, 86-87 (2nd Cir. 2000).  It is well established that the First Amendment prohibits government entities from punishing its employees in retaliation for the content of their public speech.  See, e.g., Waters v. Churchill, 511 U.S. 661, 668, 671-75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); Rankin v. McPherson, 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1986); Pickering v. Bd. of Educ., 391, U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

To state a First Amendment retaliation claim, a public employee plaintiff must allege

18

that "(1) [her] speech addressed a matter of public concern, (2) [s]he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said his speech was a motivating factor in the determination." Velez v. Levy, 401 F.3d 75, 95 (2nd Cir. 2005) (quoting Feingold v. N.Y., 366 F.3d 138, 160 (2nd Cir. 2004.)) (internal quotation marks omitted).  Once the plaintiff meets its burden, the employer may still avoid liability if it shows it would have taken the same adverse action even without the protected speech.  Mandell v. Cnty. of Suffolk, 316 F.3d 368, 382-83 (2nd Cir. 2003.)

### 1.     *Prima Facie* Case

Defendants do not dispute Plaintiff suffered an adverse employment action, but argue she fails to establish the first and third elements a *prima facie* case of First Amendment retaliation against Dr. Pivarunas and UMRS.  (Defs.' Pivarunas and Hassett Memo., p.15; Def. UMRS Memo., pp.19-20)

### a.     Protected Speech

Plaintiff asserts her "intentions to complain and her complaints" about the Defendants' failure to schedule medical residents work hours in accordance with the New York State Health Code is a matter of public concern.  (Id., pp.3-4, 6.)  Further, she asserts her complaints were not made for her own benefit since she had already completed her graduation requirements, but were instead motivated by broader concerns for patient care. (Id., p.7.)  Defendants argue that Plaintiff's complaints of being overworked were not a matter of public concern, but were instead personal in nature.  (Defs.' Pivarunas and Hassett Memo., p. 17.)

As a general rule, speech on "any matter of political, social, or other concerns to the community" is protected by the First Amendment.  Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  However, "when a public employee's speech is focused on personal matters, it is not considered to be a matter of public concern."  Isaac v. City of N.Y., 701 F.Supp.2d 477, 495 (S.D.N.Y. 2010).  In order to determine whether the speech addresses a matter of public concern, the court must examine the content, form, and context of the plaintiff's statements.  Pickering, 391 U.S. 563 at 571-72.

As discussed, *infra*, the first time Plaintiff mentioned she was "overworked" was in an e-mail to Dr. Pivarunas on November 28, 2004.  (Pivarunas Dec. ¶ 25, Ex. N.)  She stated that she had worked longer than twenty-four hour shifts, and, on more than two occasions, worked seven days in a row without twenty-four hours off, thus violating the regulations.  (Id., Ex. N.)

This e-mail was written in response to a letter Dr. Pivarunas wrote to Plaintiff on November 24, 2004, warning that she must improver her performance or be placed on probation.  (Id. ¶ 24, Ex. M.)  This letter came on the heels of several meetings Dr. Pivarunas had with Plaintiff regarding complaints he received about her lack of professionalism, lack of truthfulness, and mistreatment of patients.

The second time Plaintiff raised the issue of being overworked was on May 3, 2005. (Pivarunas Dec. ¶ 36, Ex. U.)  When Dr. Pivarunas voiced his concerns about Plaintiff's lack of professionalism and interpersonal skills, Plaintiff stated that being overworked as chief and being on beeper call led to her poor behavior.  (Id., Ex. U.)  Plaintiff also took issue with not receiving time off for vacation that she had requested.  (Id.)

Even though the public may have a concern for the number of consecutive hours

a resident may work, the fact that Plaintiff's comments can be construed broadly to implicate matters of public concern does not alter the general nature of her statements. Ezekwo, 940 F.2d at 781.  Given the context, form, and content of the speech, it is apparent that Plaintiff did not make these statements for the good of the public.  Rather, she made them to "protect her own reputation and individual development as a doctor." Id.  At the time of Plaintiff's speech, her professional reputation was on the line, and she was in danger of being put on probation.  Thus, these remarks were not made for the public interest, but to justify her behavior in response to allegations of lack of professionalism and truthfulness and the possibility of probation.

Plaintiff has failed to show she engaged in protected speech, thus she has not satisfied the first element of her *prima facie* case.

### b.    Causal Connection

Even if the Court were to find Plaintiff engaged in protected speech, she must still establish a causal connection between her speech and the adverse action to finish her *prima facie* case.  Plaintiff asserts she voiced her concerns about the hours and shifts the residents were being asked to work to Dr. Pivarunas on May 3, 2005, and told him she intended on telling the Dean the same.  (Pl. Aff. ¶ 16; Pl.'s Memo., p. 6.)  Three weeks later, at her scheduled meeting with the Dean, Dr. Pivarunas told Plaintiff she was terminated.  (Pl.'s Memo. p. 11.)  However,  Defendants point out that Plaintiff first made complaints about being overworked in November 2004, which, they argue, is not close enough in time to establish a causal connection.  (Defs.' Memo., p. 17.)

A causal connection may be established either:

> "(1) indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engage in similar conduct, or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."

Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2nd Cir. 2000).  "The causal connection must be sufficient to support the inference that the [protected conduct] played a 'substantial' or 'motivating' part in the employer's adverse employment action."  Crosland v. City of N.Y., 140 F.Supp.2d 300, 311 (S.D.N.Y. 2001) (citations omitted).  This means that "the adverse employment action would not have been taken absent the employee's protected speech."  Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999).

There is no bright line rule as to "when the temporal link becomes too attenuated to establish a causal relationship."  See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2nd Cir. 2001).  Plaintiff's first complaint of being overworked was in November 2004, six months prior to her termination in May 2005.  District courts in this Circuit have found a period of six months is a close call.  See Agostino v. Simpson, No. 08 Civ. 5760, 2008 WL 4906140, at * 7 (S.D.N.Y. Nov. 11, 2008) (holding "six months seems to be on the outer edge of that which is considered close enough to raise an inference of retaliatory motive").  However, without any other direct or circumstantial evidence, temporal proximity is insufficient to satisfy a Plaintiff's burden of showing pretext.  Simpson v. New York State Dep't of Civil Servs., 166 Fed.Appx. 499, 502 (2nd Cir. 2006); see Stoddard v. Eastman Kodak Co., 309 Fed.Appx. 475 (2nd Cir. 2009) ("where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established).

The termination letter from the University specifically states that the reason for Plaintiff's dismissal was because she failed to state on her employment application that she was placed on academic probation at UNMC.  (Pivarunas Dec., Ex. EE.)  Plaintiff argues that this justification for her termination was pretext.  (Pl. Memo. p.11.)

First, Plaintiff avers she was not required to report a probationary period on an employment application where it had been "remediated and the program successfully completed."  (Id.)  Plaintiff does not cite any evidence that probation is not a disciplinary action subject to disclosure.  In addition, she disclosed in her application that she was put on academic probation at Lankenau Hospital.  It is unclear why Plaintiff understood it necessary to disclose this probation, but not the one at UNMC.  In fact, the Level II committee found it "inconsistent and possibly disingenuous, to admit to one problem while concealing the other."  (Defs.' Pivarunas and Hassett Stmt., Ex. D, ¶ 17.2.)

Second, Plaintiff avers she discussed all of her past residency experience during the interviews and provided copies of the same, yet provides no evidence of this to the Court.  (Pl. Aff. ¶ 4.)  Dr. Pivarunas, on the other hand, argues Plaintiff did not discuss in her interview that she left LSU after one year and joined the program at UNMC in September of that same year, that she had not completed her second year at UNMC, or that she was put on probation at UNMC.  He states that if he had been notified of these factors at the time of the interview, he would have checked the records as he did with Lankenau Hospital when Plaintiff admitted she was put on probation there.  (Pivarunas Dec. ¶ 7.)  Construed in the light most favorable to Plaintiff, even if she had discussed her prior residencies, she still falsified information on her Application in violation of the University's policy.  Thus, this allegation is not enough to establish a causal relationship.

Lastly, Plaintiff argues the fact that Dr. Pivarunas promoted her to fourth year residency and signed a Personnel Transaction Form on April 22, 2005 indicates he was prepared to graduate her until she complained about the work hours.  (Pl. Memo., p. 11.) Defendants argue Plaintiff's reasoning is baseless because  Dr. Pivarunas was not put on notice that there was a discrepancy with her employment history or application until April 15, 2005.  (Pivarunas Dec. ¶ 35.)  He did not know she even attended a residency program at UNMC until May 3, 2005.  (Id. ¶ 40.)  And, he was not informed about her probation at UNMC until May 20, 2005.  (Id. ¶ 50.)  Given the chronology and the fact that Plaintiff first complained of being overworked on November 28, 2004, Plaintiff has not shown that the justification for her termination was pretext.

Plaintiff fails to put forth evidence linking her termination to her complaints about being overworked, and has not made out her *prima facie* case.

### c.     Dr. Pivarunas would have taken the same actions without Plaintiff's speech.

Even if Plaintiff were able to demonstrate a *prima facie* case, Defendants "can still prevail on a motion for summary judgment if [they] can show that [they] would have taken the same adverse employment action even in the absence of the protected conduct." Cotarelo v. Village of Sleepy Hollow Police Dep't., 460 F.3d 247, 251 (2nd Cir. 2006).

Defendants state Plaintiff would have been dismissed, regardless of her complaints, pursuant to the Dismissal and Grievance Procedure Polices of the University, which states, "falsification or omission of application information and supporting documents" are grounds for termination or non-renewal.  (Pivarunas and Hassett Memo., p. 20; Pivarunas Dec., Ex. FF.)  Furthermore, UMRS notes that neither the decision of the Level II hearing, nor the

Level III hearing mention anything about Plaintiff's complaints of work hours.  (Def. UMRS Memo., p. 22; UMRS Stmt, Ex. D, I.)  Thus, her alleged complaints were not relevant to either decision.  (Def. UMRS Memo., p. 22.)  Therefore, Defendants' decision to terminate was pursuant to the policy and procedures of the University and are reasonable grounds for termination.

**D.**     **State Law Claims**

The Court declines to exercise jurisdiction over Plaintiff's state law claims since, as discussed *infra*, all federal claims are dismissed.  28 U.S.C. § 1367(c)(3).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are granted.

## IV.  ORDERS

IT HEREBY IS ORDERED, that Defendants Pivarunas and Hassett's Motion for Summary Judgment (Docket No. 31) is GRANTED.

FURTHER, that Defendant University Medical Residence Services's Motion for Summary Judgment (Docket No. 37) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:  March 12, 2011
          Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court